## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | |
|---|---|
| LAS VEGAS SUN, INC.,<br><br>                    Plaintiff,<br><br>    v.<br><br>SHELDON ADELSON, PATRICK DUMONT, NEWS+MEDIA CAPITAL GROUP LLC, LAS VEGAS REVIEW-JOURNAL, INC., and JOHN DOES 1-X,<br><br>                Defendants. | Case No. ___3:21-mc-17___<br><br><br>Underlying Litigation:<br>2:19-cv-1667-GMN-VCF<br>United States District Court<br>District of Nevada |
| LAS VEGAS REVIEW-JOURNAL, INC.,<br><br>                Counterclaimant,<br><br>    v.<br><br>LAS VEGAS SUN, INC.; BRIAN GREENSPUN; GREENSPUN MEDIA GROUP, LLC,<br><br>                Counterclaim Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF LAS VEGAS SUN, INC.'S MOTION TO COMPEL NON-PARTY MICHAEL SCHROEDER TO COMPLY WITH A SUBPOENA

## Table of Contents

Page

TABLE OF AUTHORITIES .............................................................................................. iii

PRELIMINARY STATEMENT .......................................................................................... 1

BACKGROUND ................................................................................................................. 4

    I.      Schroeder Played a Central Role in the Early Part of Adelson's Scheme .............. 4

    II.     The District Court in the Nevada Action Denies Defendants' Motion to Dismiss and the Magistrate JUDGE Finds the Sun's Document Requests to Defendants Relevant. ....................................................................................... 8

    III.    Schroeder Refuses to Produce Relevant Documents Based On Invalid Objections And Misplaced Reliance on the Transcript Ruling. ........................... 13

ARGUMENT .................................................................................................................... 15

    I.      Schroeder Bears The Burden to Demonstrate Why The Motion Should Not Be Granted. ...................................................................................................... 15

    II.     Schroeder Cannot Carry His Burden To Resist Production Of The Subpoenaed Documents. .................................................................................. 18

           A.    The Requests Are Relevant and Appropriately Tailored. .......................... 18

                 1.    The Request for Schroeder's Consulting Agreements Is Relevant And Not Unduly Burdensome. ...................................... 18

                 2.    The Requests Related to Schroeder's Role as Clarkin and the Review-Journal's Investigations into Judges and Adelson's Competitors are Relevant to Show the Adelsons' Intent to Drive Competition Out of the Market to Secure an Unchallenged Platform to Support the Adelsons' Positions.......... 19

                 3.    The Requests Related to Schroeder's Role in the Purchase and Management of the Review-Journal Are Relevant to Show Why and How the Adelsons Carried Out Their Anti-Competitive Scheme. ..................................................................... 22

                 4.    The Requests Related to Schroeder's Management Plan and Financial Projections for the Review Journal Are Relevant to Show Anti-Competitive Injury and Anti-Competitive Actions with Regards to the Sun.................................................. 23

           B.    Schroeder Cannot Meet His Burden By Mischaracterizing A Discovery Ruling in the Nevada Action. ................................................ 24

                 1.    The Subpoena Seeks Documents that Are Different than Those at Issue in the Transcript Ruling. ...................................... 26

2.      New Evidence Also Precludes Giving the Transcript Ruling
        Any Binding Effect ....................................................................................30

C.   Schroeder May Not Evade Production by Relying on Boilerplate
     Objections. ............................................................................................................31

CONCLUSION ...........................................................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aggrenox Antitrust Litig.*,
    No. 3:14-MD-02516 (SRU), 2018 WL 834228 (D. Conn. Feb. 12, 2018)............................24

*Ahern v. Trans Union LLC Zale Corp.*,
    No. 01-cv-02313 (DJS), 2002 WL 32114492 (D. Conn. Oct. 23, 2002)................................16

*Boutvis v. Risk Mgmt. Alternatives, Inc.*,
    No. CIV. 01-cv-1933 (DJS), 2002 WL 971666 (D. Conn. May 3, 2002) ........................16, 32

*Caro v. Weintraub*,
    No. 3:09-CV-1353 (PCD), 2011 WL 13233934 (D. Conn. Mar. 4, 2011)............................17

*Certain Underwriters at Lloyd's v. Nat'l R.R. Passenger Corp.*,
    No. 16-MC-2778 (FB), 2016 WL 6902140 (E.D.N.Y. Nov. 23, 2016) .........................31, 32

*Cole v. Towers Perrin Forster & Crosby*,
    256 F.R.D. 79 (D. Conn. 2009)............................................................................................15

*Compagnie Francaise D'Assurance Pour Le Commerce Exterieur v. Phillips
    Petroleum Co.*,
    105 F.R.D. 16 (S.D.N.Y. 1984) ...........................................................................................16

*Daval Steel Prods. v. M/V Fakredine*,
    951 F.2d 1357 (2d Cir. 1991)...............................................................................................16

*In re Dzierzawski*,
    528 B.R. 397 (Bankr. E.D. Mich. 2015) ..............................................................................25

*East Point Sys., Inc. v. Maxim, S2K, Inc.*,
    No. 3:13-cv-00215 VAB, 2015 WL 1971453 (D. Conn. Apr. 30, 2015) ..............................15

*EchoStar Satellite v. Viewtech, Inc.*,
    No. 10-60069-MC, 2010 WL 2822109 (S.D. Fla. July 16, 2010) .........................................25

*Est. of Lopes v. Barnhardt*,
    No. C 04-5379 VRW, 2005 WL 8165531 (N.D. Cal. Dec. 28, 2005), *aff'd sub
    nom. Lopes v. Astrue*, 277 F. App'x 757 (9th Cir. 2008)......................................................26

*In re Genentech Herceptin (Trastuzumab) Mktg. & Sales Practices Litig.*,
    No. 16-MD-2700, 2017 WL 4010845 (N.D. Okla. Sept. 12, 2017)......................................17

*Glen Holly Entm't Inc. v. Tektronix Inc.*,
    352 F.3d 367 (9th Cir. 2003) .................................................................................................9

*Guadalupe v. City of New York*,
No. 15-cv-0220 (CM) (JCF), 2016 WL 3570545 (S.D.N.Y. June 24, 2016) ........................18

*Indep. Party of CT-State Cent. v. Merrill*,
200 A.3d 1118 (Conn. 2019) .................................................................................................25

*Int'l Shoe Mach. Corp. v. United Shoe Mach. Corp.*,
167 F. Supp. 93 (D. Mass. 1958) ..........................................................................................26

*Jackson v. AFSCME Local 196*,
246 F.R.D. 410 (D. Conn. 2007)............................................................................................17

*Joseph v. Harris Corp.*,
677 F.2d 985 (3rd Cir.1982) ..................................................................................................16

*Kennedy v. Basil*,
No. 18-CV-2501(ALC)(KNF), 2019 WL 2343153 (S.D.N.Y. June 3, 2019) ........................31

*Lorenz v. Beltio, Ltd.*,
963 P.2d 488 (Nev. 1998) .......................................................................................................9

*In re PE Corp. Sec. Litig.*,
No. 3:00 CV 705 CFD TPS, 2005 WL 806719 (D. Conn. Apr. 8, 2005)................................16

*Ramos v. Town of E. Hartford*,
No. 3:16-CV-166 (VLB), 2016 WL 7340282 (D. Conn. Dec. 19, 2016)...............................31

*Resol. Tr. Corp. v. Massachusetts Mut. Life Ins. Co.*,
200 F.R.D. 183 (W.D.N.Y. 2001)..........................................................................................26

*Rodriguez v. Clark*,
No. 3:16-CV-390 (CSH), 2017 WL 2369367 (D. Conn. May 31, 2017) ...............................16

*Royal Park Investments SA/NV v. Deutsche Bank Nat'l Tr. Co.*,
No. 14-cv-04394 (AJN) (BCM), 2016 WL 4613390 (S.D.N.Y. Aug. 31, 2016).............15, 17

*In re Sandoval*,
232 P.3d 422 (Nev. 2010) ......................................................................................................25

*Stancuna v. Iovene*,
No. 3:08-CV-30 (JBA), 2016 WL 11589754 (D. Conn. Oct. 31, 2016) ................................15

*State Farm Mut. Auto. Ins. Co. v. Fayda*,
No. 14 Civ. 9792 (WHP) (JCF), 2015 WL 7871037 (S.D.N.Y. Dec. 3, 2015),
*aff'd,* No. 14CV9792, 2016 WL 4530890 (S.D.N.Y. Mar. 24, 2016) ...................................16

*Travelers Indem. Co. v. Metro. Life Ins. Co.*,
228 F.R.D. 111 (D. Conn. 2005)............................................................................................17

*United States v. Uccio*,
 940 F.2d 753 (2d Cir. 1991)............................................................................26, 30

**Rules**

Fed. R. Civ. P. 26................................................................................13, 15, 17, 18

Fed. R. Civ. P. 45.........................................................................................15, 25

**Statutes**

Clayton Act, Section 7 ..........................................................................................8

NRS Chapter 598A ............................................................................................3, 8

Sherman Anti-Trust Act, Section 2.......................................................................3, 8

**Secondary Sources**

Charles A. Wright, et al., 8A Federal Practice & Procedure (2d ed. 1994)...................................16

Plaintiff Las Vegas Sun, Inc. (the "Sun") respectfully submits this memorandum of law in support of its motion to compel (the "Motion") non-party Michael Schroeder ("Schroeder") to comply with the subpoena to produce documents served on him on December 22, 2020 (the "Subpoena") in the underlying action pending in the United States District Court for the District of Nevada, *Las Vegas Sun Inc. v. Adelson, et al.*, Case No. 2:19-cv-1667-GMN-BNW (D. Nev.) (the "Nevada Action"). The Subpoena is attached as **Exhibit 1**.[1]

## PRELIMINARY STATEMENT

Who is Edward Clarkin?  This question fascinated elite media circles in December 2015 after Clarkin published a scathing attack on a Nevada state court judge presiding over a high-profile case involving the late billionaire mogul, casino owner, and Las Vegas resident Adelson.[2]  Not only was Clarkin an unknown journalist, but the articles were published in local Connecticut newspapers, the Bristol Press and the New Britain Herald—neither of which had any connection to the Nevada litigation or appeared to employ a journalist named Clarkin.[3]  After the publisher of those newspapers, Schroeder, mysteriously appeared at the Las Vegas Review-Journal (the "Review-Journal") announcing himself as its new manager, journalists across America—including from national papers like the *New York Times* and *Chicago Tribune*—chased the

---

[1] Use of "Exhibit" refers to an Exhibit to the Declaration of Marla J. Hudgens, dated April 2, 2021 (the "Hudgens Decl."), which accompanies this motion.

[2] *See* Maria Bustillos, *How the Las Vegas Review-Journal Unmasked its Owners*, The New Yorker (Jan. 8, 2016), https://www.newyorker.com/business/currency/how-the-las-vegas-review-journal-unmasked-its-owners; Judd Legum, *Edward Clarkin Is the Most Important Man in Journalism Today—And He's Probably Not A Real Person*, ThinkProgress (Dec. 26, 2015), https://archive.thinkprogress.org/edward-clarkin-is-the-most-important-man-in-journalism-today-and-hes-probably-not-a-real-person-dd975ccf7519/; Matthew Kauffman, *Mystery Surrounds Newspaper's Relationship to Las Vegas Casino Mogul Sheldon Adelson's Legal Fight*, Hartford Courant (Dec. 23, 2015), https://www.courant.com/community/new-britain/hc-new-britain-herald-edward-clarkin-1223-20151223-story.html; James DeHaven et al., *Mystery Surrounds Writer's Name*, Las Vegas Review-Journal (Dec. 23, 2015), https://www.reviewjournal.com/local/local-las-vegas/mystery-surrounds-writers-name/.

[3] *See, e.g.*, Bustillos, *How the Las Vegas Review-Journal Unmasked its Owners*, *supra* n.2*;* Legum, *Edward Clarkin Is the Most Important Man in Journalism Today*, *supra* n.2.

Clarkin/Schroeder story for weeks, unearthing Clarkin's unethical and sloppy journalism, his invention of quotations, and his plagiarized passages.[4]  Sleuthing journalists quickly uncovered that Schroeder's middle name is Edward and that his mother's maiden name is Clarkin.

Journalists thus turned their focus to Schroeder, and the pieces continued to come together. Schroeder announced that he would be leading the Review-Journal as the representative of its new owners, but refused to name them.  Nonetheless, in short order, journalists at the Review-Journal exposed that the Adelson family were the purchasers of the Review-Journal and that Schroeder was working for them.  Once this connection was made, it all made sense: the Nevada state court judge whom Schroeder (a/k/a Clarkin) attacked with invented quotes and passages pulled from other stories unattached to Las Vegas courts, Judge Elizabeth Gonzalez, was then presiding over a case exposing Adelson's blind eye to prostitution at his casinos and the ties between his casinos and organized crime.   In the proceedings, Judge Gonzalez reprimanded Adelson over his obstructionism in court and issued orders unfavorable to his case, including imposing sanctions on Adelson.  These revelations exposed Schroeder as Adelson's lackey, handpicked to craft a false and anonymous editorial hit job on the judge who had ruled unfavorably against Adelson and to manage the newspaper that Adelson had just purchased.  In response, a longtime reporter at the New Britain Herald quit, explaining that the Clarkin piece had "Schroeder's fingerprints all over it" and that Schroeder "basically used the pages of my newspaper, secretly, to further the political agenda of his master out in Las Vegas."[5]

---

[4] *See* Bustillos, *How the Las Vegas Review-Journal Unmasked its Owners,* supra n.2; Legum, *Clarkin Is the Most Important Man in Journalism Today*, *supra* n.2; Matthew Kauffman, *Controversial Article Has Passages Nearly Identical to Those in Other Publications*, Hartford Courant (Dec. 23, 2015), https://www.courant.com/news/connecticut/hc-new-britain-herald-aba-huffpost-1224-20151223-story.html; Sydney Ember, *Publisher Puzzles Staff with His Role in Las Vegas*, New York Times (Jan. 6, 2016), https://www.nytimes.com/2016/01/07/business/media/a-publisher-puzzles-staff-with-his-role-in-las-vegas.html.

[5] Legum, *Clarkin Is the Most Important Man in Journalism Today*, *supra* n.2.

After his role as "Clarkin" was exposed, Schroeder published a *mea culpa* in his Connecticut newspapers admitting that he had failed to disclose his business relationship with Adelson (without, however, admitting he was Clarkin).  Shortly thereafter, he was fired by the Adelson-controlled Review-Journal even though Patrick Dumont, Adelson's son-in-law, was well aware of the Clarkin article and even reviewed drafts before it was published.  When reached for comments about these matters, Schroeder referred journalists to a crisis spokesperson Adelson hired to manage the scandal.  Weeks after the Gonzalez story exploded, in early January 2016, Schroeder was suddenly removed from recently filed LLC organization papers designating him as the manager of the Review-Journal.

Against this backdrop, the Sun served a Subpoena on Schroeder, seeking documents regarding his pivotal role in the antitrust conspiracy that is the subject of the Sun's Nevada Action against Adelson, members of his family, and his affiliates, including the Las Vegas Review-Journal Inc., which owned and operated the Review-Journal, a newspaper Adelson purchased to act as his mouthpiece to influence public policy and intimidate judges (collectively, "Defendants").  In the Nevada Action, the Sun alleges that Defendants have improperly attempted to drive the Sun out of business, in violation of Section 2 of the Sherman Anti-Trust Act and the Nevada Unfair Trade Practices Act, so that the Adelson family can eliminate the Sun and monopolize the local daily print newspaper market in Clark County, Nevada (where Las Vegas is located).  Given Schroeder's central role at the scheme's inception—acting as a functional hitman in charge of the Review-Journal charged with crushing Adelson's enemies—the documents sought from Schroeder regarding, among other things, his ties to Adelson, the plans for the Review-Journal, the publication of the "Clarkin" article, and his attempted intimidation of Judge Gonzalez clearly are relevant.  Yet, despite extensive meet-and-confer dialogue, Schroeder has refused to produce wide

swaths of relevant documents based on boilerplate objections and baseless relevance arguments. He even has refused to produce documents of the type and category already produced by Defendants.

As set forth herein, Schroeder cannot meet his burden to resist the production of the highly relevant materials sought by the Subpoena.  Accordingly, the Court should grant the Motion in its entirety.

## **<u>BACKGROUND</u>**

### I.    **SCHROEDER PLAYED A CENTRAL ROLE IN THE EARLY PART OF ADELSON'S SCHEME**

The Nevada Action is a complex antitrust action between the only two local daily print newspapers published and distributed in Clark County, Nevada: the Sun and the Review-Journal (together, the "Newspapers"), and their owners.  Under the terms of a joint operating agreement ("JOA") between the Newspapers (as amended in 2005), the Sun, a left-leaning newspaper, and the Review-Journal, a right-leaning newspaper, are printed and distributed in a single-packaged yet separately-branded newspaper product whereby the Sun is included inside the Review-Journal, while each newspaper maintains separate control over its news and editorial staff and publishing decisions.  *See* Nevada Action Complaint (the "Complaint") ¶¶ 23-27 (**Exhibit 2**).  Under the JOA, the Review-Journal is in control of all non-editorial functions of the parties' joint operation and owes fiduciary duties to the Sun as the dominant newspaper in the joint operation.

As alleged in the Complaint, in 2015, Adelson and his son-in-law, Patrick Dumont (together, the "Adelsons"), entered into talks to purchase the Review-Journal through a shell company called News+Media Capital Group, LLC ("News+").  *Id.* ¶¶ 8, 11, 49.  Their objective was clear: to own and control a newspaper in their hometown, Las Vegas, that reflected their conservative political views, took favorable stances on their "passion topics," attempted to sway

the public to Adelson's chosen positions, and allowed them to silence those who would speak out against them or offer alternative viewpoints. *Id.* Both before and after completing the purchase, they sought to use (and have used) the Review-Journal to attack competitors of Adelson's businesses, reward friends, punish perceived enemies, pressure judges presiding over cases involving Adelson, and to endorse state legislation to benefit Adelson-owned companies. *Id.* But the Adelsons wanted more than this powerful tool to bend the community to their will. They wanted to be the *only* voice in the local daily print newspaper market. *Id.* In order to do so, they needed to eliminate the Review-Journal's only direct competitor in the market and the only plausible force to challenge the Review-Journal's Adelson-defined agenda, the Sun. Thus, as alleged in the Complaint, before they even acquired the Review-Journal, the Adelsons began plotting how to drive the Sun out of business in an effort to monopolize the local daily print newspaper market in Clark County. *Id.* ¶¶ 54-56.

Central to their scheme, from its earliest days, was Schroeder. *Id.* ¶ 50. As set forth in the Complaint, Schroeder's actions on Defendants' behalf were multifaceted.

First, at Adelson's direction and with Dumont's input, Schroeder used his Connecticut newspapers to publish a falsified article condemning Judge Gonzalez, a Nevada state court judge presiding over a high-profile employee termination case in which Adelson was a defendant. The Adelsons directed Schroeder to write an article attacking Judge Gonzalez, which he did under his pen name, Edward Clarkin. *Id.* ¶ 52. Specifically, Schroeder worked directly with Dumont, sharing drafts of the article before it was published. Email Bates Stamped DEFS0018912, (**Exhibit 3**). Schroeder then published the article in his Connecticut newspapers, the Bristol Press and the New Britain Herald, in December 2015, hoping that the story would be picked up by larger

news outlets such as the Associated Press.[6]  The article was filled with plagiarized material and fabricated quotes.  **Ex. 2** ¶ 52.  As one 20-year journalist who worked for Schroeder announced in connection with his departure from Schroeder's newspaper, Schroeder had funneled "a terrible, plagiarized piece of garbage about the court system" into the paper, and had "used the pages of my newspaper, secretly, to further the political agenda of his master out in Las Vegas."  *Id.*

Second, the Sun has discovered that Schroeder participated in due diligence discussions involving the Adelsons' purchase of the Review-Journal.  *See* Email Bates Stamped DEFS0018959-90 (**Exhibit 4**).  The due diligence process necessarily entailed consideration of valuations, the purchase price of the Review-Journal, the projected financial performance of the Review-Journal, the Sun, and the joint operation—all key topics in determining how the Adelsons were valuing the Review-Journal, the JOA, and the Sun, and how they planned to eliminate the competition.  *See* Emails Bates Stamped SCHROEDER 000001-07 (**Exhibit 5**).  The purchase price and valuations also provide information relevant to the Sun's damages in the Nevada Action.

Third, Schroeder was involved in discussions to terminate the JOA, the agreement that binds the Review-Journal and the Sun.  Specifically, Schroeder brainstormed different ideas with the Adelsons' consultants and agents, including an "███████████████████████████" *Id.* at SCHROEDER 000006.  The JOA allowed the Sun to become profitable when the Sun had been operating at a loss in the late 1980s by transferring all printing, advertising, and distribution responsibilities to the Review-Journal in exchange for relinquishing valuable contracts and operating infrastructure in favor of periodic payments of profits from the new joint operation.  **Ex. 2** ¶¶ 19, 22.  In the years preceding the Adelsons' purchase, the JOA allowed the Sun to

---

[6] Legum, *Edward Clarkin Is the Most Important Man in Journalism Today*, *supra* n.2; Kauffman, *Mystery Surrounds Newspaper's Relationship*, *supra* n.2; James DeHaven et al., *Mystery Surrounds Writer's Name*, *supra* n.2.

successfully maintain its business.  If the JOA were terminated, the Sun would be left without any way to produce, print, and distribute its newspaper, since the Sun had previously relinquished its printing press, circulation lists, advertising lists, and all noneditorial business functions in exchange for the Review-Journal controlling those services for the Newspapers over 30 years and providing the Sun with profit payments.  *Id.* ¶¶ 19, 114.

Finally, Schroeder acted as the public face of the Review-Journal, and was listed in its filed operating documents as manager, to conceal Adelson's identity as the true owner of the newspaper. *Id.* ¶ 50.  In essence, Schroeder was retained and employed to provide an important service: anonymity for the Adelsons.  Indeed, in what became a national story, Schroeder arrived in the Review-Journal's newsroom and announced that he was the manager of the Review-Journal, but refused to reveal the true owners of the newspaper.[7]  This sent reporters into a flurry of activity; they quickly revealed that Adelson, in the shadows, was the actual owner and operator of the newspaper.  *Id.*  This made big news in Nevada given Adelson's ownership of some of the largest and most lucrative gaming facilities in the State and his status as a large political contributor to right wing causes and candidates.[8]  Given the Adelsons' mammoth presence in Las Vegas and in the gaming industry generally, anonymity offered the Adelsons an opportunity to control the news narrative in Las Vegas without the public's (or the Sun's) knowledge.  Once Adelson was unveiled, Schroeder was immediately ousted from the Review-Journal.[9]   (Not surprisingly, given the

---

[7] *See, e.g.*, Ember, *A Publisher Puzzles Staff With His Role in Las Vegas*, *supra* at n. 3.

[8] *See, e.g.*, Bustilloa, *How the Las Vegas Review-Journal Unmasked Its Owners*, *supra* at n. 4; Laura Wagner, *More Journalists Leaving 'Las Vegas Review-Journal' After Sale to Billionaire*, NPR (May 9, 2016), https://www.npr.org/sections/thetwo-way/2016/05/09/477423367/more-journalists-leaving-las-vegas-review-journal-after-sale-to-billionaire.

[9] Sydney Ember, *Manager of Las Vegas Review-Journal Is Removed*, New York Times (Jan. 4, 2016), https://www.nytimes.com/2016/01/05/business/media/manager-oflas-vegas-review-journal-is-removed.html.

Adelsons' well-known vindictiveness, so too were the Review-Journal reporters who revealed Schroeder's true employer.)

All told, as set forth in detail in the Complaint, Schroeder was a key player who helped kickstart Defendants' anticompetitive scheme and has first-hand knowledge of the purposes behind it.

## II.   THE DISTRICT COURT IN THE NEVADA ACTION DENIES DEFENDANTS' MOTION TO DISMISS AND THE MAGISTRATE JUDGE FINDS THE SUN'S DOCUMENT REQUESTS TO DEFENDANTS RELEVANT.

### 1.   Most of the Sun's Antitrust Claims Survive Defendants' Failed Motion to Dismiss.

The Sun alleged in its Complaint five claims for relief under the Sherman Act, the Clayton Act, and Nevada's Unfair Trade Practices Act (NRS Chapter 598A). *Id.* It also alleged that Adelson is the alter ego of the Review-Journal. *Id.* ¶ 8. On October 30, 2019, Defendants filed motions to dismiss. *See* Order dated Nov. 30, 2020 (**Exhibit 6**).

On November 30, 2020, the Nevada district court denied, in large part, the motions to dismiss (the "Motion to Dismiss Decision"). Three of the five claims originally pleaded survived in their entirety—the Sun's Section 2 claims for monopolization, attempted monopolization, and violation of the Nevada Unfair Trade Practices Act. **Ex. 6**. The court dismissed the Sun's claim for conspiracy to monopolize as alleged against Adelson and Dumont, and dismissed the Sun's claim for violation of Section 7 of the Clayton Act against all parties. *Id.* at 15.

In the Motion to Dismiss Decision, the Nevada district court highlighted several issues that bear on the Subpoena. First, the court held that the Sun sufficiently pleaded its alter ego claim against Adelson. The Sun's alter ego claim has three elements: (1) the corporation is influenced and governed by the person asserted to be its alter ego, (2) there is such a unity of interest and ownership that one is inseparable from the other, and (3) the facts are such that adherence to the

fiction of a separate entity would sanction fraud or promote injustice.  *Id.* at 15-16; *see also Lorenz v. Beltio, Ltd.*, 963 P.2d 488, 496 (Nev. 1998).  As to the first element, the Nevada district court ruled that the Sun adequately alleged that Adelson exercised "significant influence over the RJ's policies, business, and editorial content."  **Ex. 6** at 16.  As to the second and third elements, the Nevada district court specifically cited the Sun's allegations regarding Schroeder:

> The Sun further alleges that Adelson: *ordered Michael Schroeder to use one of his 'Connecticut newspapers and write and publish an article condemning' a Nevada state court judge which presided over a high profile case in which Adelson was a defendant*; removed the [Review-Journal]'s publisher, Jason Taylor, because Adelson wanted someone who was more in line with his vision; and replaced Taylor with Craig Moon, who subsequently 'executed on Defendants' strategy to financially starve the Sun and to force it out of business.' As such, [the Sun]'s Complaint asserts sufficient factual matter to establish the influence and unity of interest elements."

*Id.* at 16-17 (emphasis added); *see also* **Ex. 2 ¶¶** 50-53, 61-64.

Second, the Nevada district court held that the Sun supported its allegation of antitrust injury by alleging that the Sun and the Review Journal engaged in editorial competition.  In so holding, the Nevada district court rejected Defendants' argument that the alleged conduct is not "of the type the antitrust laws were intended to prevent."  To the contrary, the court ruled that antitrust laws are aimed at protecting not only economic competition, but also editorial competition.  As a result, the Nevada district court held that harm to editorial competition supported the Sun's antitrust injury.  **Ex. 6** at 12-13; *see also Glen Holly Entm't Inc. v. Tektronix Inc.,* 352 F.3d 367, 371 (9th Cir. 2003) (stating that a well-recognized anticompetitive effect is elimination of a competitor from the market and reduction of consumer choices).

### 2.      The Magistrate Judge's Party Discovery Rulings

Although the Nevada district court did not issue the Motion to Dismiss Decision until November 2020, discovery in the Nevada Action had been ongoing since May 2020.  Prior to the Motion to Dismiss Decision, a magistrate judge made several discovery rulings.  Schroeder has

latched onto one particular ruling—a November 13, 2020 transcript ruling (the "Transcript Ruling")—as a pretext for resisting the Subpoena. Once placed in context, it is apparent that the Transcript Ruling—which involved different document requests directed to Defendants (not Schroeder) regarding their communications about and coverage of several topics—is irrelevant.

The Transcript Ruling has its roots in an earlier ruling. In June 2020, the Sun moved to compel Defendants to produce, among other things, "all documents and communications in [the Defendants'] possession that concern or relate to [the Review-Journal's] investigation of the Las Vegas Convention and Visitors Authority [("LVCVA")], from December 10, 2015 to present." Plaintiff's Motion to Compel Production of Documents (**Exhibit 7**) at 11. The LVCVA is a competitor of the Sands Expo and Convention Center, owned by Adelson, which the Review-Journal has attacked in at least 69 articles since the Adelsons' acquisition. The Sun sought documents related to these attacks to show that the Review-Journal was Adelson's alter ego. *See* Transcript of July 20, 2020 Hearing (**Exhibit 8**) at 16:5-17:13. In a transcript ruling on the relevance of this request (the "June Ruling"), the magistrate judge originally assigned to the Nevada Action stated that, until she was presented with evidence to the contrary, she was taking Defendants' implicit contention that Adelson was only a distant investor in the Review-Journal at face value. *Id.* at 51:1-51:24. Thus, the magistrate judge limited discovery to direct (as opposed to indirect) directives from Adelson regarding the Review-Journal. However, this was not a final ruling on the matter, and the magistrate judge made it clear that "[t]o the extent that, through interrogatories or other discovery tools, [the Sun] find[s] that Mr. Adelson did, in fact, verbally command others to do something else, then I think that there would be -- the relevance would be more clear to me." *Id*. at 15:14-16:4.

Following the June Ruling, the Sun served the Subpoena on Schroeder seeking documents and communications related to Schroeder's work for Adelson and the Review-Journal, as further described *infra* at 18-24.  Meanwhile, in the Nevada Action, Defendants were slow-walking their production of documents.  Hudgens Decl., at ¶ 8.  While still awaiting document production from Defendants, the Sun sought to compel production of further documents from them.  *Id*.

This subsequent motion to compel led to the Transcript Ruling.  In this motion to compel, the Sun sought, among other things (1) documents relating to communications between certain Defendants and the Review-Journal regarding Judge Gonzalez (Requests Nos. 107-112), and (2) documents related to the Review-Journal's coverage of the purchase of the Review-Journal (Requests Nos. 128-132).  Plaintiff's Motion to Compel Production of Documents (Second Set) (**Exhibit 9**).[10]  These requests were different from the ones made to Schroeder, as discussed further *infra* at 27-31.  Indeed, none of the requests at issue in the motion to compel related directly to Schroeder because Defendants had already voluntarily agreed to produce documents related to Schroeder/Clarkin (Requests Nos. 102-106).  *Id.* at 39-44.

On November 13, 2020, the magistrate judge issued the Transcript Ruling, addressing, among other requests, Requests Nos. 107-112 and 128-132.  Because Defendants still had not produced many documents, the result of the hearing was largely the same as the June Ruling—the requests were narrowed to direct directives from Adelson to the Review-Journal about Judge Gonzalez and the Review-Journal's coverage of its purchase because the Sun at that juncture did not have evidence demonstrating that Adelson was issuing directives indirectly through subordinates.  Transcript of November 13, 2020 Hearing (**Exhibit 10**) at 17:10-18:15.  Once again, the magistrate judge made clear that this was not a final ruling on the matter: after the Sun inquired

---

[10] The full text of these Requests may be found *infra* at 28 and 30.

11

if it could seek reconsideration once it had gained sufficient evidence to show Adelson issued directives indirectly, the magistrate judge replied "you can always seek the Court[ ] – to reevaluate its position." *Id.* at 22:18-22:25.

Following the Transcript Ruling, Defendants produced a number of bombshell documents. One such document was an Employment Agreement executed in February 2016, which formally made Adelson the co-publisher of the Review-Journal and entitled him to "confer with and provide editorial advice and assistance, as appropriate, to the President and Publisher and other editorial employees and contributors to the Las Vegas Review-Journal Newspaper . . . concerning the direction of the Newspaper, topics for day-to-day or investigative or other coverage by the Newspaper." Employment Agreement dated February 11, 2016 (**Exhibit 11**).  Also produced were e-mails between Dumont and Schroeder discussing the forthcoming Clarkin article, with Schroeder saying to Dumont that "███████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████" and "███████████████████████████

████████████████████████████████████████████████████████████████

███████" **Ex. 3**.  In yet another document, Adelson's assistant told the owner of the Sun that "█

████████████████████████████████████████████████████████████████

███████" Email Bates Stamped DEFS0018484-86 (**Exhibit 12**).

After these productions, which revealed the missing link to make the Sun's requests relevant, the Sun filed a Motion to Reconsider Previous Discovery Rulings Based on New Evidence (**Exhibit 13**), asking the magistrate judge to reconsider the November Order on Request No. 47 and the trickledown effect that it had on subsequent Request Nos. 107 through 112 and 128 through 132.  During oral argument and based on the strength of the evidence, the-then magistrate

judge articulated her "*intent . . . to grant the motion to reconsider*" her previous discovery rulings. Transcript of January 5, 2021 Hearing (**Exhibit 14**) at 7:9-16 (emphasis added).  Thereafter, a new magistrate judge was assigned to the case.  On March 18, 2021, the newly-assigned magistrate judge denied the motion without prejudice and ordered the parties to meet and confer on all of the issues raised in the motion before the Sun refiles its motion.  Order Dated March 18, 2021 (**Exhibit 15**), at 12-14.

## III. SCHROEDER REFUSES TO PRODUCE RELEVANT DOCUMENTS BASED ON INVALID OBJECTIONS AND MISPLACED RELIANCE ON THE TRANSCRIPT RULING.

Despite the Sun's reasonable concessions during the parties' meet-and-confer dialogue, Schroeder has refused to produce many categories of highly relevant documents.  The Sun served the original version of the Subpoena on August 30, 2020, and Schroeder served responses and objections on September 29, 2020.  (The Sun later served the operative version of the Subpoena, which amended the place of compliance to be Connecticut, but otherwise remained identical).  True and accurate copies of the Subpoena and of Schroeder's responses are attached as Exhibits 1 and 16.  Schroeder's objections were made up almost entirely of boilerplate objections that were copy-pasted in response to each request.  See, e.g., **Ex. 16** (starting each objection to a request with "Schroeder objects to this request as seeking documents that are not relevant to any party's claim or defense and proportional to the needs of the case under Fed. R. Civ. P. 26(b)(1)" without specifying why the request was not relevant or proportional).  There was no confirmation in Schroeder's objections that he would produce any documents.  Id.

On October 22, 2020, the parties met and conferred by phone regarding Schroeder's objections to the Subpoena.  Hudgens Decl. ¶ 11.  At the meet-and-confer and subsequently, the Sun made multiple concessions in an effort to avoid the need for motion practice.  In response to relevance objections, the Sun agreed to provide various documents to demonstrate the relevance

of its demands, which Schroeder's counsel agreed to review.  The Sun also agreed to withdraw several Requests, including Request No. 5 and Requests Nos. 9 and 11 based on the parties' agreement that documents responsive to Requests Nos. 9 and 11 would be captured by the responses to other Requests.  Email Chain with the Subject Line "RE: Las Vegas Sun, Inc. v. Adelson et al." (**Exhibit 17**) at 2-7.

Following the telephonic meet-and-confer, the parties continued to exchange emails regarding the scope of production over the course of October 2020 to January 2021.  Id.  The Sun made yet additional concessions.  For example, the parties reached an agreement with regards to Request 6, where Schroeder agreed to search for a limited subset of documents relating to the Review-Journal's previous arbitrations with the Sun.  Id.  However, after reviewing the Transcript Ruling, Schroeder struck a different tone, latching onto the Transcript Ruling and refusing to produce documents in response to numerous Subpoena Requests, including Requests Nos. 1, 2, 3, 4, 7, 8, and 13.  Id.  Schroeder also stood on his boilerplate objection to Request No. 10, claiming consulting agreements were not relevant to monopolization claims, without providing any further explanation.  Id.  As to the remaining requests, Schroeder agreed to produce a very limited subset of documents related to any plans by Defendants to end the JOA or to charge certain costs to the JOA, which were not supposed to be charged to the JOA under the JOA's terms.  Id.

Schroeder's resulting production was anemic.  In total, Schroeder produced a mere 18 documents, totaling 61 pages, all of which are marked "Attorneys' Eyes Only."  **Ex. 5**.  Tellingly, the production is comprised entirely of documents from December 24, 2014, through January 11, 2015, with the exception of one partially redacted email from September 2015.  In other words, the production is devoid of a single document in December 2015, when Schroeder masqueraded

as "Clarkin" and appeared at the Review-Journal as corporate manager to run the newspaper under the thumb of Adelson.  Id.

Despite this obvious and massive deficiency in his production, Schroeder has refused to produce any further documents.  Hudgens Decl. ¶ 13.

## ARGUMENT

### I.   SCHROEDER BEARS THE BURDEN TO DEMONSTRATE WHY THE MOTION SHOULD NOT BE GRANTED.

A Rule 45 subpoena may seek all non-privileged information that is reasonably calculated to lead to the discovery of admissible evidence.  Fed. R. Civ. P. 26(b); *see also East Point Sys., Inc. v. Maxim, S2K, Inc.*, No. 3:13-cv-00215 VAB, 2015 WL 1971453, at *2 (D. Conn. Apr. 30, 2015) ("The scope of discovery under a Rule 45 subpoena is the same as that permitted under Rule 26.").  If the recipient of a subpoena objects to the production of any documents, "the requesting party bears the initial burden of demonstrating any possibility of relevance sufficient to warrant discovery."  *Royal Park Investments SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-cv-04394 (AJN) (BCM), 2016 WL 4613390, at *7 (S.D.N.Y. Aug. 31, 2016) (internal citations and quotations omitted).  However, once the requesting party shows "any possibility of relevance," "[t]he party resisting discovery bears the burden of showing why discovery should be denied." *Stancuna v. Iovene*, No. 3:08-CV-30 (JBA), 2016 WL 11589754, at *2 (D. Conn. Oct. 31, 2016) (citing *Cole v. Towers Perrin Forster & Crosby*, 256 F.R.D. 79, 80 (D. Conn. 2009)).

Schroeder cannot meet his burden to establish the validity of his objections:

**Relevance.**  A person resisting discovery on the grounds of relevance "may not leave it to the court to sift through each [request] to determine the usefulness of the [documents] sought.  To the contrary, the claims in the complaint define the liberal guidelines for determining the relevance of the discovery requests, and the burden is on the party resisting discovery to clarify and explain

its objections and to provide support for those objections." *Ahern v. Trans Union LLC Zale Corp*., No. 01-cv-02313 (DJS), 2002 WL 32114492, at *2 (D. Conn. Oct. 23, 2002). "The mere statement by a party that discovery is 'irrelevant and immaterial' is not enough to discharge this burden." *Boutvis v. Risk Mgmt. Alternatives, Inc.*, No. CIV. 01-cv-1933 (DJS), 2002 WL 971666, at *1 (D. Conn. May 3, 2002) (citing *Joseph v. Harris Corp.*, 677 F.2d 985, 992 (3rd Cir.1982)).

Relevance under the Federal Rules is to be "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on any party's claim or defense." *State Farm Mut. Auto. Ins. Co. v. Fayda*, No. 14 Civ. 9792 (WHP) (JCF), 2015 WL 7871037 (S.D.N.Y. Dec. 3, 2015), *aff'd,* No. 14CV9792, 2016 WL 4530890 (S.D.N.Y. Mar. 24, 2016). In the Second Circuit, "[t]his obviously broad rule is liberally construed." *Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1367 (2d Cir. 1991); *see also Rodriguez v. Clark*, No. 3:16-CV-390 (CSH), 2017 WL 2369367, at *3 (D. Conn. May 31, 2017) ("[I]t is well-established in federal litigation that the scope of discovery is broad.").

**Burden.** To interpose a proper objection on the grounds that a request is "overly broad" or "unduly burdensome," the objecting party must do more than "simply intone [the] familiar litany that the [requests] are burdensome, oppressive or overly broad." *In re PE Corp. Sec. Litig.*, No. 3:00 CV 705 CFD TPS, 2005 WL 806719 (D. Conn. Apr. 8, 2005) (citing *Compagnie Francaise D'Assurance Pour Le Commerce Exterieur v. Phillips Petroleum Co.*, 105 F.R.D. 16, 42 (S.D.N.Y. 1984), & Charles A. Wright, et al., 8A Federal Practice & Procedure § 2174, at 297 (2d ed. 1994)). "Instead, the objecting party bears the burden of demonstrating specifically how, despite the broad and liberal construction afforded the federal discovery rules, each request is not relevant or how each question is overly broad, burdensome or oppressive by submitting affidavits or offering evidence revealing the nature of the burden." *Id.* (internal citations and quotation marks omitted);

16

*see also Caro v. Weintraub*, No. 3:09-CV-1353 (PCD), 2011 WL 13233934, at *2 (D. Conn. Mar. 4, 2011).

Where the objecting party claims that compliance would be unduly burdensome, the Court weighs the burden to the objecting party against the value of information to the serving party. *Travelers Indem. Co. v. Metro. Life Ins. Co.*, 228 F.R.D. 111, 113 (D. Conn. 2005). Whether a subpoena imposes an "undue burden" depends on "such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed." *Id.*; *Jackson v. AFSCME Local 196*, 246 F.R.D. 410, 412 (D. Conn. 2007). While courts generally give more weight to burden arguments when a subpoena seeks discovery from a non-party, this weight is diminished where, as here, the non-party is closely related to the suit or the parties. *See In re Genentech Herceptin (Trastuzumab) Mktg. & Sales Practices Litig.*, No. 16-MD-2700, 2017 WL 4010845, at *2 (N.D. Okla. Sept. 12, 2017) (holding "relationship of the nonparty to the parties is one factor to be considered" in a burden analysis and compelling discovery from non-party that manufactured medicine for defendant because manufacturer was "not a distant third party to this litigation").

**Proportionality.** "Restoring the proportionality calculation to Rule 26(b)(1) [in the 2015 amendment] . . . d[id] not place on the party seeking discovery the burden of addressing all proportionality considerations." *Royal Park Investments*, 2016 WL 4613390, at *7 (further stating the burden remains on the party resisting discovery). A party resisting discovery on the grounds of proportionality "at least has the obligation to address those proportionality factors pertinent to th[e] case and provide specific evidence and argument about them to the extent possible; it is not

enough merely to invoke the word 'burden' as a talisman."  *Guadalupe v. City of New York*, No. 15-cv-0220 (CM) (JCF), 2016 WL 3570545, at *2 (S.D.N.Y. June 24, 2016).

Proportionality to the needs of the case is evaluated by considering "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1).

**II.    SCHROEDER CANNOT CARRY HIS BURDEN TO RESIST PRODUCTION OF THE SUBPOENAED DOCUMENTS.**

As further set forth below, the Subpoena Requests clearly are relevant to the claims and defenses in the Nevada Action in multiple respects, including with respect to Defendants' anticompetitive intent, the Sun's alter ego claim against Adelson, the Sun's damages, and the harm to consumers as a result of Defendants' anticompetitive scheme.  Schroeder cannot meet his burden to dispel the relevance of the Requests and thus must be compelled to respond.

**A.    The Requests Are Relevant and Appropriately Tailored.**

**1.    The Request for Schroeder's Consulting Agreements Is Relevant And Not Unduly Burdensome.**

Request No. 10 is clear and straightforward.  It seeks copies of any consulting or consultant agreement regarding Schroeder's work with the Review-Journal and/or News+:

> **Request No. 10:** To the extent not produced, produce a copy of any consulting or consultant agreement concerning or relating to the Review-Journal and/or News+Media.

This request is relevant to the Defendants' anti-competitive motive and the Sun's alter ego theories.  Among other things, the consulting agreements would show that Schroeder was acting at Adelson's behest and would indicate the timeframe and scope of his engagement, including whether he was carrying out Adelson's (or the Adelson family's) directives when he wrote the

Clarkin article and was named (briefly, until he was exposed) as manager of the Review-Journal. Such information would tend to make it more likely that Adelson was treating the Review-Journal as his alter -ego.  The consulting agreements also are relevant to the Sun's allegations that the Adelsons intended to conceal their ownership of the Review-Journal so that they could obtain a monopoly over the local, daily print newspaper market in Clark County without the public realizing their influence.  This concealment is relevant to show Defendants' anti-competitive motive.  By attempting to make it appear that the Review-Journal was being controlled by someone in the newspaper industry not connected with one of Nevada's most powerful families (*i.e.*, Schroeder, rather than the Adelsons), the Adelsons were attempting (unsuccessfully) to hide the real reason the Review-Journal was acquired—as one step in their plan to monopolize the relevant market in Las Vegas.  The Adelsons sought out a hitman in Schroeder who would dutifully and dishonestly produce the kind of content they desired; as soon as he was exposed by the Review-Journal's own journalists, he was of no further use to the Adelsons and was promptly removed.

Schroeder has proffered no basis to justify his refusal to produce these basic and readily-identifiable documents, apart from boilerplate objections, which, as set forth below, are insufficient as a matter of law.

> ### 2. The Requests Related to Schroeder's Role as Clarkin and the Review-Journal's Investigations into Judges and Adelson's Competitors are Relevant to Show the Adelsons' Intent to Drive Competition Out of the Market to Secure an Unchallenged Platform to Support the Adelsons' Positions.

Requests Nos. 3, 4, 7, and 8 seek information related to Adelson's attacks on the Nevada judiciary and on his competitors both through Schroeder's oversight of the Review-Journal and through Schroeder's role as "Clarkin" in Connecticut:

> **Request No. 3:** Produce all Documents and Communications, including text messages, that concern or relate to Edward Clarkin's article, "Business courts a way for state economies to remain

competitive," which appeared in Bristol Press and New Britain Herald in early December 2015.

**Request No. 4:** Produce all Communications, including text messages, between You and the following individuals: Sheldon Adelson, Miriam Adelson, Patrick Dumont, Frank Vega, Mike Hengel, Calvin Seimer, Russel Pergament, or any other Person or Representative acting on their behalf concerning or relating to the Sun, the JOA, the Review-Journal's investigations into Clark County judges, including Judge Elizabeth Gonzalez, the Las Vegas Convention and Visitors Authority, Proposition 3, NV Energy, Steve Wynn, and/or the MGM.[11]

**Request No. 7:** Produce all Documents and Communications that concern Your connection to, or Your use of the name or pseudonym, Edward Clarkin.

**Request No. 8:** Produce all Documents and Communications that concern, relate to, or reference Eighth Judicial District Court of Nevada District Court Judge Elizabeth Gonzalez.

Requests Nos. 3, 4, 7, and 8 are at the core of Schroeder's connection to the Nevada Action and are relevant to the Sun's antitrust and alter ego claims. The Requests are relevant to the Sun's antitrust claims because they will provide documents showing Defendants' anti-competitive motive and the harm to consumers if competition is eliminated. More specifically, the Sun alleges that the Adelsons were motivated to buy the Review-Journal to monopolize the editorial voice in the Clark County daily print news market so that they could have, among other things, an unrebutted platform to attack judges making unfavorable rulings against Adelson and to attack Adelson's competitors. The attack on state court judges is particularly notable in Nevada given

---

[11] Adelson and Dumont are Defendants. The Sun is in the process of filing a motion to substitute Adelson's estate as the proper defendant following Adelson's death. Other key players include: Dr. Miriam Adelson, Adelson's widow who is intimately involved in the affairs of the Review-Journal; Frank Vega, a consultant who helped Defendants implement their anticompetitive scheme; Mike Hengel, a former editor of the Review-Journal who accepted a buyout shortly after Adelson purchased the paper; Calvin Seimer, in-house counsel at Las Vegas Sands Corp.; and Russel Pergament, who introduced Adelson to Schroeder. **Ex. 2** at * [Decl.*].

that state court judges are elected to 6-year terms.  A negative media attack on a particular judge can therefore heavily influence the Las Vegas electorate.

Among other things, the Sun alleges that: (1) Adelson, through others, ordered reporters from the Review-Journal to monitor the courtroom of Judge Gonzalez to intimidate her (**Ex. 2** ¶ 51); (2) Adelson ordered Schroeder to use his Connecticut newspapers to publish a false and irresponsible article condemning Judge Gonzalez's record (*id.* ¶ 52); and (3) Adelson wanted the Sun out of the way because the Sun was standing "between Adelson and his vision of the Review-Journal as his mouthpiece and sole editorial voice in the Las Vegas area" (*id.* ¶ 54).  The documents the Sun seeks from Schroeder will show the Adelsons' anti-competitive intent by indicating why the Adelsons wanted to own the Review-Journal and how they intended to use the Review-Journal as their mouthpiece and figurehead to manipulate public policy in Nevada.  The documents also will show the harm to consumers should the Review-Journal's sole competitor be driven from the market—such as Defendants' ability to intimidate judges, misrepresent public policy to warp the civic discussion, reward friends, and damage competitors with little fear of dissenting voices in the press.  These documents are even more important now due to Adelson's death as they represent the only source of information on what Adelson actually desired and intended—information the Sun can no longer get through a deposition of Adelson.

For similar reasons, the documents are relevant to the Sun's alter ego claim because they would tend to show that Adelson treated the Review-Journal as his personal mouthpiece and propaganda arm.  In fact, in denying Adelson's motion to dismiss the alter ego claim against Adelson, the Nevada district court explicitly mentioned the Sun's allegations regarding Adelson's use of Schroeder to conceal his attacks on the Nevada judiciary.  **Ex. 6**, at 16.  Consequently, the

Nevada district court already has ruled that discovery into Schroeder's attacks on the judiciary, including through the "Clarkin" article, are relevant.

### 3. The Requests Related to Schroeder's Role in the Purchase and Management of the Review-Journal Are Relevant to Show Why and How the Adelsons Carried Out Their Anti-Competitive Scheme.

Requests Nos. 1, 2, and 13 seek information about the decision to name Schroeder as the face of Adelson's purchase of the Review-Journal, his role in that purchase, his consulting agreement, his strategies and plans, and his financial projections:

> **Request No. 1:** Produce all Documents and Communications, including text messages, that concern or relate to the Review-Journal's choice or decision to name You as the manager or Representative of the Review-Journal and/or News+Media in 2015.

> **Request No. 2:** Produce all Documents and Communications, including text messages, that relate to Your role in the purchase of the Review-Journal in 2015, including Your role as representative of the buyer.

> **Request No. 13**: To the extent not provided, produce all Documents or Communications concerning or relating to Defendants' intent, plan, desire, or wish to keep the ownership of the Review-Journal secret.

These Requests are relevant to show anti-competitive motive and anti-competitive conduct as well as to prove the Sun's alter ego claim. The Sun has alleged that the Adelsons wanted to force competition out of the local daily print newspaper market so that they could have the sole editorial voice in the relevant market. The Sun also has alleged that the Adelsons attempted to conceal this motive by placing Schroeder as a figurehead at the top of the Review-Journal, so that the public and the Sun would not be able to determine the Adelsons' true motive to force competition out of the market—or that the Adelsons were making the decisions to accomplish that goal. The documents sought in Requests Nos. 1, 2, and 13 all relate to how Schroeder was selected to manage the Review-Journal, his role in helping the Adelsons to acquire the Review-Journal, his

role in helping them to conceal their ownership, and his knowledge of (and influence in) Defendants' scheme. Each of these Requests are tailored to find documents which would support the Sun's contentions about Defendants' anti-competitive motive.

The documents also would show how the Adelsons planned to execute their anti-competitive scheme even at its early stages. For instance, documents about the decision to name Schroeder as the manager of the Review-Journal would show that he was picked due to his willingness to undertake any task assigned to him by the Adelsons, including a plan to aggressively end the JOA with the Sun—one of the steps the Adelsons wanted to take in the hope of eliminating the Review-Journal's sole competitor.

The Requests also are likely to lead to discoverable information about the Sun's alter ego claim. It is doubtful Schroeder was named manager of the Review-Journal without any direction from Adelson or those acting at Adelson's behest. Information about the decision to name Schroeder as the manager will reveal who made that decision and why. That information will be crucial to showing Adelson's anti-competitive intent. For all these reasons, Requests Nos. 1, 2, and 13 are relevant.

    **4. The Requests Related to Schroeder's Management Plan and Financial Projections for the Review Journal Are Relevant to Show Anti-Competitive Injury and Anti-Competitive Actions with Regards to the Sun.**

Requests Nos. 12 and 14 seek information relating to Schroeder's management plans and financial projections for the Review Journal:

> **Request No. 12:** Produce all Documents or Communications concerning or relating to Your strategies, plans, initiatives, or focus as manager, director, editor, or publisher of the Review-Journal and/or News+Media.

> **Request No. 14:** Produce all Documents or Communications concerning or relating to Your financial plans or projections for the Review-Journal.

23

Requests Nos. 12 and 14 are relevant because they seek information that will show how Defendants implemented their anti-competitive plan.  Schroeder's management strategy and plans, which were likely made in collaboration with the Adelsons, who named him as the Review-Journal's manager, are likely to show how Defendants planned to squeeze out the Sun.  The financial projections would establish a baseline of the Sun's and the JOA's performance to further support the notion that the Adelsons' actions were designed to run the Sun out of business.

The documents sought also are relevant to the Sun's damages.  The magistrate judge in the Nevada Action already has held that valuations are relevant and discoverable, explaining that "The Sun argues and the Court agrees, [valuation] information is relevant to the issue of damages as it relates to the value of the [joint operation] before and after the purchase of the [Review-Journal]." **Ex. 10** at 13:20-14:1.  Schroeder assisted the Adelsons with their due diligence efforts.  **Ex. 5**, at SCHROEDER 000001-07.  The due diligence process entailed consideration of valuations, the price of the Review-Journal, projected financial performance, and the joint operation.  Schroeder is therefore likely to have documents and communications relevant to damages and that specifically relate to the value of the joint operation before and after Adelson came to power, a topic which the Nevada district court already has found to be relevant.

### B.    Schroeder Cannot Meet His Burden By Mischaracterizing A Discovery Ruling in the Nevada Action.

Schroeder's principal basis for withholding copious relevant documents is his misplaced assertion that "the documents sought by th[ese] Request[s] have been determined to be irrelevant to the claims and defenses in this action by the [Transcript Ruling]."  **Ex. 17**, at 3.  This assertion is wrong as a matter of fact and law.

As a threshold matter, ordinary course discovery rulings—here, a transcript ruling expressly leaving open reconsideration—are not final orders.  *See In re Aggrenox Antitrust Litig.*,

No. 3:14-MD-02516 (SRU), 2018 WL 834228, at *3 (D. Conn. Feb. 12, 2018) (holding "run-of-the-mill order compelling discovery" is not a final order).  Simply stated, non-final discovery orders like the Transcript Ruling are not given preclusive effect.  *See Indep. Party of CT-State Cent. v. Merrill*, 200 A.3d 1118, 1142-43 (Conn. 2019); *In re Sandoval*, 232 P.3d 422, 423 (Nev. 2010); *see also In re Dzierzawski*, 528 B.R. 397, 416, n.36 (Bankr. E.D. Mich. 2015) ("Because the discovery orders are not final orders, arguably they would not have preclusive effect.").

At most, discovery rulings may be considered "law of the case" in certain narrow circumstances.  *See EchoStar Satellite v. Viewtech, Inc.*, No. 10-60069-MC, 2010 WL 2822109 (S.D. Fla. July 16, 2010).  But here, Schroeder relies on a Transcript Ruling that clearly is not, and was not intended to be, a final and binding ruling as to the specific requests at issue, much less as to the Subpoena.  In narrowing the scope of discovery in the June Ruling that was a precursor to the Transcript Ruling, the magistrate judge stated, "To the extent that, through interrogatories or other discovery tools, you find that Mr. Adelson did, in fact, verbally command others to do something else, then I think that there would be – the relevance would be more clear to me."  **Ex. 8** at 15:19–16:1-4.  Subsequently, in the Transcript Ruling itself, the magistrate judge expressly stated that if new information became available, "you can always seek the Court[] – to reevaluate its position."  **Ex. 10** at 22:18-22:25.  And after Defendants produced new documents establishing the missing link, the Sun filed a motion for reconsideration of the magistrate judge's discovery rulings.  At a hearing on the motion for reconsideration, the-then magistrate judge indicated her "intent [ ] to grant the motion to reconsider," **Ex. 14** at 7:9-7:16,[12] and the now-assigned judge

---

[12] During oral argument on the motion, the magistrate judge articulated he "intent [] to grant the motion to reconsider," which would mean that the current limitations embedded in the Order would no longer control. **Ex. 14** at 7:9-16.  Although the magistrate judge has since been replaced following recusal, the Sun continues to believe the Order will be vacated.  Thus, in the event the Court concludes that the November Order may control the disputed requests in the Subpoena, the Sun respectfully requests, in the alternative, that this motion be transferred to Nevada pursuant to Rule 45(f).

ordered the parties to further meet and confer on the issues.  **Ex. 15**.  Thus, for this reason alone, the Court should reject Schroeder's attempt to mischaracterize the Transcript Ruling as a final, binding ruling that somehow excuses his withholding of copious relevant documents.

In any case, the Court should reject Schroeder's reliance on the Transcript Ruling because courts generally have recognized that the law of the case doctrine is inapplicable unless a previous discovery ruling explicitly addressed the very documents sought in a later motion.[13]  As set forth in Section B.1, that clearly is not the case here.  In addition, as set forth in Section B.2*, the law of the case doctrine is subject to numerous exceptions, including, as relevant here, circumstances involving new evidence.  *See United States v. Uccio*, 940 F.2d 753, 758 (2d Cir. 1991).  Therefore, for the reasons further set forth below, Schroeder should not be permitted to withhold relevant documents based on the Transcript Ruling.

### 1.  The Subpoena Seeks Documents that Are Different than Those at Issue in the Transcript Ruling.

Schroeder's reliance on the Transcript Ruling must be rejected because the Subpoena was not before the magistrate judge when she issued the Transcript Ruling—nor could it have been. And there is no basis to read the Transcript Ruling as a ruling on the Subpoena's Requests, particularly given the magistrate judge's command for further meet and confer efforts.  *See supra* n.13 (collecting cases).

---

[13] *See Est. of Lopes v. Barnhardt*, No. C 04-5379 VRW, 2005 WL 8165531 (N.D. Cal. Dec. 28, 2005), *aff'd sub nom. Lopes v. Astrue*, 277 F. App'x 757 (9th Cir. 2008) (holding ALJ was not required to review all medical records starting from 1993 on remand based on court's prior discovery ruling that medical records from 1995 were relevant to the case because "law of the case doctrine [applies] only to the explicit issue decided in the discovery order"); *Resol. Tr. Corp. v. Massachusetts Mut. Life Ins. Co.*, 200 F.R.D. 183 (W.D.N.Y. 2001) (holding no law of the case effect on motion to compel because court "never specifically addressed the production of the" requested document in its prior order); *see also Int'l Shoe Mach. Corp. v. United Shoe Mach. Corp.*, 167 F. Supp. 93, 95 (D. Mass. 1958) ("I do not believe that [a prior ruling involving the same defendant] should be followed in situations such as this where the ruling is only upon discovery matters and is not dispositive of the case.").

As an initial matter, it bears emphasis that the Subpoena's Requests overlap with requests that were *not* the subject of the Transcript Ruling because the Defendants *voluntarily produced the requested documents*.  Specifically, the Sun's Requests Nos. 102-106 to Defendants sought any communications between Adelson and some of the other Defendants, on one hand, and "Michael Schroeder (aka Edward Clarkin)" on the other.  **Ex. 9**, at 39-44.  Tellingly, while Defendants have fought most of the Sun's discovery requests, they voluntarily agreed to produce documents in response to these requests, which, like the Subpoena's Requests, are specifically about Schroeder. This is a tacit admission by Defendants that communications between Adelson and his affiliates and Schroeder are relevant, and it eviscerates the notion that the magistrate judge somehow should be deemed to have ruled on the Subpoena's Requests.

Indeed, the Subpoena Requests are different on their face from those considered by the magistrate judge in the Transcript Ruling.  Starting with Requests Nos. 1, 2 and 13, Schroeder claims that they are covered by the portion of the November Order regarding communications about the Review-Journal's *coverage of its sale*. For the Court's convenience, a comparison of the requests is set out below:

| Request to Review-Journal | Request to Schroeder |
|---|---|
| Produce all communications in Your possession, custody, or control between Sheldon Adelson, on the one hand, and any of Your Representatives, ***that concern or relate to the Review-Journal's Coverage of the purchase of the Review-Journal*** that occurred on or about December 10, 2015. (Request No. 128) | Produce all Documents and Communications, including text messages, that concern or relate to the Review-Journal's choice or decision to name You as the manager or Representative of the Review-Journal and/or News+Media in 2015. (Request No. 1) |

| | |
|---|---|
| Produce all communications in Your possession, custody, or control between Patrick Dumont, on the one hand, and any of Your Representatives, ***that concern or relate to the Review-Journal's Coverage of the purchase of the Review-Journal*** that occurred on or about December 10, 2015. (Request No. 129) | Produce all Documents and Communications, including text messages, that relate to Your role in the purchase of the Review-Journal in 2015, including Your role as representative of the buyer. (Request No. 2) |
| Produce all communications in Your possession, custody, or control between Miriam Adelson, on the one hand, and any of Your Representatives, ***that concern or relate to the Review-Journal's Coverage of the purchase of the Review-Journal*** that occurred on or about December 10, 2015. (Request No. 130) | To the extent not provided, produce all Documents or Communications concerning or relating to Defendants' intent, plan, desire, or wish to keep the ownership of the Review-Journal secret. (Request No. 13) |
| Produce all communications in Your possession, custody, or control between Frank Vega, on the one hand, and any of Your Representatives, ***that concern or relate to the Review-Journal's Coverage of the purchase of the Review-Journal*** that occurred on or about December 10, 2015. (Request No. 131) | |
| To the extent not already produced, produce all communications in Your possession, custody, or control between or among Sheldon Adelson, Miriam Adelson, Patrick Dumont, and/or Frank Vega ***that concern or relate to the Review-Journal's Coverage of the purchase of the Review-Journal*** that occurred on or about December 10, 2015. (Request No. 132) | |

As illustrated above, the Subpoena Requests seek documents about why Schroeder was named as a representative for Adelson at the Review-Journal, his role in the purchase of the Review-Journal, and why the Adelsons wanted to hide their ownership of the Review-Journal. None of the Subpoena's requests relate to the Review-Journal's *coverage* of the purchase of the Review-Journal.

This difference is material. A request about the Review-Journal's coverage—*i.e.*, what it may or may not write in its pages—seeks materially different information than requests about

*Schroeder's actual conduct and discussions with Adelson*, which will shed light on, among other things, Adelson's motive and intent for buying the Review-Journal, as well as the relationship between Adelson and Schroeder.   Indeed, the Nevada district judge already has held that Schroeder's conduct is relevant to the alter ego claim in the Motion to Dismiss Decision.

Schroeder also claims that Requests Nos. 3, 4, 7, and 8 are covered by the portion of the Transcript Ruling regarding *communications between Adelson and the Review-Journal* about Judge Gonzalez because they partially seek information about Schroeder's attacks on the Nevada judiciary.   But again, the Requests the Sun made to Schroeder are different on their face:

| Request to Review-Journal | Request to Schroeder |
|---|---|
| To the extent not already produced, produce all communications in Your possession, custody, or control between Sheldon Adelson, on the one hand, and any of Your Representatives, that concern or relate to Eighth Judicial District Court Judge Elizabeth Gonzales. (Request No. 107) | Produce all Documents and Communications, including text messages, that concern or relate to Edward Clarkin's article, "Business courts a way for state economies to remain competitive," which appeared in Bristol Press and New Britain Herald in early December 2015. (Request No. 3) |
| To the extent not already produced, produce all communications in Your possession, custody, or control between Patrick Dumont, on the one hand, and any of Your representatives, that concern or relate to Eighth Judicial District Court Judge Elizabeth Gonzales. (Request No. 108) | Produce all Communications, including text messages, between You and the following individuals: Sheldon Adelson, Miriam Adelson, Patrick Dumont, Frank Vega, Mike Hengel, Calvin Seimer, Russel Pergament, or any other Person or Representative acting on their behalf concerning or relating to the Sun, the JOA, the Review-Journal's investigations into Clark County judges, including Judge Elizabeth Gonzalez, the Las Vegas Convention and Visitors Authority, Proposition 3, NV Energy, Steve Wynn, and/or the MGM. (Request No. 4) |
| To the extent not already produced, produce all communications in Your possession, custody, or control between Miriam Adelson, on the one hand, and any of Your Representatives, that concern or relate to Eighth Judicial District Court Judge Elizabeth Gonzales. (Request No. 109) | Produce all Documents and Communications that concern Your connection to, or Your use of the name or pseudonym, Edward Clarkin. (Request No. 7) |

| | |
|---|---|
| To the extent not already produced, produce all communications in Your possession, custody, or control between Frank Vega, on the one hand, and any of Your Representatives, that concern or relate to Eighth Judicial District Court Judge Elizabeth Gonzales. (Request No. 110) | Produce all Documents and Communications that concern, relate to, or reference Eighth Judicial District Court of Nevada District Court Judge Elizabeth Gonzales. (Request No. 8) |
| To the extent not already produced, produce all communications in Your possession, custody, or control between or among Sheldon Adelson, Miriam Adelson, Patrick Dumont, and/or Frank Vega that concern or relate to Eighth Judicial District Court Judge Elizabeth Gonzales. (Request No. 111) | |

As is evident, the requests to Defendants sought communications between various persons and the named Defendants; they did not seek communications with Schroeder, which were subsumed by requests pursuant to which Defendants agreed to produce documents. The Subpoena's Requests likewise seek information related to Adelson directing Schroeder to carry out attacks against judges and competitors of his casino and convention center businesses to mask his hand behind the attacks—again, subject matter the district judge in the Nevada Action already found to be relevant to the Sun's claims. None of these Requests implicate the magistrate judge's statement in the Transcript Ruling that at the time there was an insufficient basis to require production of "indirect directives" to the Review-Journal from those other than Adelson.

In sum, given the material differences between the requests to Defendants and the Subpoena's Requests, there simply is no basis to apply the Transcript Ruling to the Subpoena.

### 2. New Evidence Also Precludes Giving the Transcript Ruling Any Binding Effect

The emergence of new evidence since the Transcript Ruling also precludes giving it any binding or "law of the case" effect. *See supra* at 26 (citing *Uccio*, 940 F.2d at 758). Indeed, since the Transcript Ruling, Defendants have produced the Employment Agreement—pivotal evidence

that demonstrates Adelson's direct involvement in the Review-Journal's operations. Among other things, the Employment Agreement outlines Adelson's duty to "confer with and provide editorial advice and assistance, as appropriate, to the President and Publisher and other editorial employees and contributors to the Las Vegas Review-Journal Newspaper . . . concerning the direction of the Newspaper, topics for day-to-day or investigative or other coverage by the Newspaper." **Ex. 11**. Additional documents produced by Defendants also reveal that Dumont was a conduit to send messages from Adelson to others, including Schroeder. **Exs. 3** & **12**. These revelations squarely refuted Defendants' assertions that Adelson was a distant owner who purchased the Review-Journal as an investment—that is, the very argument that led the magistrate judge to tentatively impose limitations on party discovery in the first place. Therefore, for this additional reason, there is no basis to allow Schroeder to exploit the Transcript Ruling to avoid producing relevant documents.

### C.    Schroeder May Not Evade Production by Relying on Boilerplate Objections.

Once Schroeder's misplaced reliance on the Transcript Ruling is set aside, all that is left is boilerplate objections. Courts in this Circuit have recognized that it is improper for a non-party to resist a subpoena by citing only boilerplate objections. See, e.g., *Certain Underwriters at Lloyd's v. Nat'l R.R. Passenger Corp.*, No. 16-MC-2778 (FB), 2016 WL 6902140 (E.D.N.Y. Nov. 23, 2016) (concluding that subpoena recipient "acted inappropriately in lodging 'non-specific, boilerplate objections' in response to [subpoena]"); see also *Kennedy v. Basil*, No. 18-CV-2501(ALC)(KNF), 2019 WL 2343153 (S.D.N.Y. June 3, 2019) (denying subpoena recipient's boilerplate objection that subpoena subjected it to "undue burden or expense" as "meritless and unsupported"); *Ramos v. Town of E. Hartford*, No. 3:16-CV-166 (VLB), 2016 WL 7340282 (D. Conn. Dec. 19, 2016) ("The Court notes that the 2015 revision of the Federal Rules precludes the use of the type of boilerplate objections on which Defendants rely.").

Boilerplate objections are all that Schroeder has offered.  For instance, Schroeder objected to most of the Requests in the Subpoena to the extent that they were "overly broad and unduly burdensome and/or expensive to comply with, particularly to the extent that it seeks 'all' documents."  **Ex. 16**.  But a request for all documents is not per se unduly burdensome in the context of a subpoena.  *Certain Underwriters at Lloyd's*, 2016 WL 6902140, at *6 ("Requests for 'all documents' are not per se improper; rather, the appropriate inquiry is whether the documents sought are relevant and the burden of compliance is proportional to the needs of the case.").  In a particularly egregious example, Schroeder objected to the production of copies of any consulting agreement between him and the Review-Journal or News+ solely on the ground that it was "not relevant to any party's claim or defense" without stating a single reason why the request was irrelevant.  Id., at 8.  These boilerplate, unspecific objections are not sufficient for Schroeder to carry his burden in resisting production.  See, e.g., Boutvis, 2002 WL 971666, at *1.  The Court should therefore compel Schroeder to comply with the Subpoena.

## <u>CONCLUSION</u>

For the foregoing reasons, the Sun respectfully requests that the Court issue an order compelling Schroeder to produce the documents requested in the Subpoena within fourteen (14) days from the entry of the order.

32

Dated: April 2, 2021                      Respectfully submitted,

                                          By:    /s/ Marc J. Gottridge
                                                 Marc J. Gottridge (ct12094)
                                                 Ryan M. Philp (admission pending)
                                                 HOGAN LOVELLS US LLP
                                                 390 Madison Avenue
                                                 New York, NY 10017
                                                 Telephone: (212) 918-3000
                                                 Facsimile: (212) 918-3100
                                                 marc.gottridge@hoganlovells.com
                                                 ryan.philp@hoganlovells.com

                                                 *Counsel for Las Vegas Sun, Inc.*